IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| AMY BENDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:19cv271-MHT |
| | ) | (WO) |
| HILTON DOMESTIC OPERATING | ) | |
| COMPANY INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Amy Bender brings this lawsuit against
defendant Hilton Domestic Operating Company Inc.
(hereinafter "Hilton Domestic"), alleging that, while
visiting Montgomery, Alabama, she tripped over a
camouflaged cord in the lobby of a DoubleTree by Hilton
Hotel (hereinafter "Montgomery DoubleTree") and
sustained injuries to her knees. Bender asserts a
claim for negligence and a claim for recklessness and
wantonness, both under Alabama law. Removal
jurisdiction based on diversity of citizenship is
proper pursuant to 28 U.S.C. §§ 1332 and 1441.

Hilton Domestic has moved for summary judgment on both of the claims.  For the reasons that follow, the motion will be granted, and judgment will be entered in favor of Hilton Domestic.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine whether a genuine factual dispute exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, "conclusory assertions," without admissible supporting evidence, "are insufficient to withstand summary judgment."  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th

2

Cir. 2019). In general, summary judgment is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## II. BACKGROUND

The parties agree on the pertinent facts regarding the incident at issue.

Hilton Domestic is the parent corporation of a number of hotel franchisors, including DoubleTree Franchise LLC. The company provides licenses to franchisees that allow the franchisees to use the Hilton brand name and marks for their hotels. At all relevant times, the Montgomery DoubleTree was among these franchised hotels. It is owned and operated by Montgomery Downtown Hotels, LLC (hereinafter "Montgomery Downtown Hotels"), pursuant to a Franchise License Agreement. Montgomery Downtown Hotels has contracted with Ascent Hospitality Management (hereinafter "Ascent Hospitality") to handle management

3

of the Montgomery DoubleTree.

On May 13, 2017, Bender was visiting Montgomery to attend her son's graduation ceremony. She stayed at the Montgomery DoubleTree. The incident at issue occurred when she left the lobby bar area of the hotel to go collect a pair of sunglasses she had forgotten. While walking toward the exit, she tripped over a lamp cord that was in her path and fell. A member of the hotel staff witnessed her fall, assisted her, and then generated a report of the incident.

Bender alleges that Hilton Domestic was both negligent and reckless and wanton in making layout and design decisions that created the hazard over which she tripped. Hilton Domestic has moved for summary judgment, emphasizing that as the franchisor it neither owned nor operated the Montgomery DoubleTree and did not control the design or layout of the lobby. The company argues that Bender has failed to state facts sufficient to establish that it owed any duties to her or any other invitee of the hotel.

**4**

## III.  DISCUSSION

Bender has disclaimed any agency theory of liability and somewhat quixotically chosen to proceed only on a direct-liability theory.  The Alabama Supreme Court has never explicitly recognized the existence of a cause of action for direct liability of a franchisor. *Compare Kennedy v. W. Sizzlin Corp.*, 857 So. 2d 71, 80 (Ala. 2003) (Moore, C.J., concurring in part and dissenting in part) ("The so-called 'direct-negligence' claims alleged are claims that Alabama courts have never recognized.") *with Bolin v. Superior Well Servs., Inc.*, No. 7:08cv1100, 2010 WL 11474092 (N.D. Ala. June 25, 2010) (Blackburn, C.J.) (reading *Kennedy* to at least implicitly recognize the existence of direct-negligence claims for franchisors).  Assuming, however, that such a cause of action exists in Alabama law, the court finds that Bender has not provided any evidence to show that Hilton Domestic owed a duty to her as a guest at one of its franchise locations.

Duty of care is a required element for a claim of either negligence or recklessness and wantonness. *See Bryan v. Ala. Power Co.*, 20 So. 3d 108, 115-16 (Ala. 2009). Whether a duty exists is "a question of law to be determined by the court." *Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 837 (Ala. 2003) (cleaned up). While Alabama courts have not defined the circumstances under which a franchisor owes a duty to customers of its franchisee, it is generally accepted in other courts and in the academic literature that the central issue is the extent of control that the franchisor exercised over the franchisee. *See* Jay Hewitt, *Franchisor Direct Liability*, 30 Franchise L.J. 35, 37 (2010) ("Direct liability cases look at the franchisor's control over the franchisee to determine if the franchisor also owes a duty to [guests, invitees, customers, and members of the public]."); *see also Kerl v. Dennis Rasmussen, Inc.*, 682 N.W.2d 328, 334 n.3 (Wis. 2004) (listing direct liability cases from various jurisdictions that "look to the

franchisor's actual control or retained right of control to determine the presence of a duty for purposes of evaluating whether the franchisor was itself negligent"). And, since the question of whether a franchisor is vicariously liable under an agency theory is based on an indistinguishable question of control, the court can look to cases discussing the requisite amount of control required for liability to attach in that context to determine what level of control is necessary for direct liability. *See* Joseph H. King, Jr., *Limiting Vicarious Liability of Franchisors for the Torts of their Franchisees*, 62 Wash. & Lee L. Rev. 417, 427 n.36 (2005) ("The line separating claims involving an undertaking of responsibilities by the franchisor sufficient to create a duty for the purposes of direct liability from claims based on franchisor control sufficient to support vicarious liability under an actual agency theory may be indiscernible, if a line exists at all."); *see also Allen v. Choice Hotels Int'l, Inc.*, 276 F. App'x 339,

343 n.4 (4th Cir. 2008) (describing both vicarious- and direct-liability analyses as turning on the franchisor's actual control or retained right of control); *Sutherland v. Barton*, 570 N.W.2d 1, 5-7 (Minn. 1997) (applying the same retention-of-control analysis to decide both direct liability and vicarious liability).

The Alabama Supreme Court has held that a franchise agreement alone, even a detailed one that demands strict compliance from the franchisee, does not establish the requisite level of control. *See Kennedy*, 857 So. 2d at 77; *see also Kerl*, 682 N.W.2d at 338 (describing "the clear trend in the case law ... that the quality and operational standards and inspection rights contained in a franchise agreement do not establish a franchisor's control or right of control over the franchisee"). Indeed, franchisors "may specify minimum standards for the operation of the business, and monitor the operations to ensure compliance with these standards," without assuming a

duty.  *Franklin v. Chick-fil-A, Inc.*, No. 2:03cv3348, 2006 WL 8436867, at *2 (N.D. Ala. May 22, 2006) (Clemon, C.J.).  To owe a duty to franchise customers under Alabama law, the franchisor must control "the daily operations" of the franchise.  *Id*.

A few courts in other jurisdictions have found that a franchisor owed a duty where it did not control the daily operations of the franchisee but did control "the particular instrumentality or design feature that caused the plaintiff's injury."  *Plunkett v. Crossroads of Lynchburg, Inc.*, No. 6:14cv28, 2015 WL 82935, at *3 (W.D. Va. Jan. 7, 2015) (Ballou, M.J.) (listing cases). For duty to attach under this theory, the plaintiff must prove that the "franchisor controlled the selection of the product which caused the injury or mandated a means or method which caused the injury." *Id*.  The level of control required is high; it "must consist of something more than a general right to make suggestions or recommendations or to order work stopped or resumed."  *Whitten v. Ky. Fried Chicken Corp.*, 570

9

N.E. 2d 1353, 1356 (Ind. Ct. App. 1991); *see also Wise v. Ky. Fried Chicken Corp.*, 555 F. Supp. 991, 995 (D.N.H. 1983) (Devine, C.J.) (finding that a franchisor exercised the requisite level of control over equipment where it operated "a sophisticated system for selecting, approving, testing, recommending, and maintaining quality control" for that equipment). The fact that the franchise agreement required a certain design feature or set standards related to it is not enough to establish the requisite level of control. *See Allen*, 276 F. App'x at 342-43.

There is no genuine dispute that Hilton Domestic lacked control over the day-to-day operations of the Montgomery DoubleTree. The parties agree that the hotel was a franchise that was neither owned nor operated by Hilton Domestic. Instead, it was owned by Montgomery Downtown Hotels, with daily management contracted to Ascent Hospitality. The employees who staffed the hotel were hired by Montgomery Downtown Hotels, not by Hilton Domestic, and Hilton Domestic

exercised no supervisory authority over them.

Bender accepts the evidence that Hilton Domestic did not engage in daily management of the Montgomery DoubleTree. However, she argues that Hilton Domestic is nevertheless liable because it controlled the instrumentality of her injury by mandating standards for the design and layout of the lobby space. Even if Alabama were to recognize this form of liability, it would be inapplicable here based on the undisputed evidence in the record.

To support her theory, Bender relies on the franchise agreement and the Product Improvement Plan. These documents obligated Montgomery Downtown Hotels to refurbish the lobby space of the Montgomery DoubleTree and set standards for how the hotel should be decorated. They further required that Montgomery Downtown Hotels submit its designs to Hilton Domestic for review and approval. But courts in Alabama have made clear that the existence and enforcement of strict and detailed design requirements in a franchise

agreement, without more, do not establish a level of control sufficient for a franchisor to owe a duty. *See Kennedy*, 857 So. 2d at 77 (holding that a franchisor's reservation of the "right to supervise" a franchisee "to determine if that person conforms to the performance required by a contract ... does not, itself, establish control"); *Wood v. Shell Oil Co.*, 495 So. 2d 1034, 1037 (Ala. 1986) (even when an agreement specifies "in some detail" how the franchisee must act and gives the franchisor the right to approve certain aspects of the operation, it does not prove that the franchisor exercised the requisite level of control for liability); *see also Allen*, 276 F. App'x at 342-43. Bender's conclusory assertions that Hilton Domestic controlled the entirety of the refurbishment process and created the hazard by exercising complete and exclusive control over the layout of the hotel, without anything in the record to support them, do nothing to bolster her insufficient argument.

The language of the franchise agreement itself

reinforces the conclusion that Hilton Domestic controlled neither the daily operations of the hotel nor the design feature that caused Bender's injury. Bender's argument that the franchisee lacked any discretion in furnishing the hotel is inaccurate. While Hilton Domestic required that Montgomery Downtown Hotels complete renovations, provided standards those renovations should meet, and reserved the right to review and approve plans for the new design, the language of the agreement gave the franchisee a variety of options in meeting Hilton Domestic's general specifications. For example, as Brian Hass, regional manager for Ascent Hospitality, testified, the requirement that the hotel provide "ample lighting" in the lobby area could be met by any configuration of lamps and overhead lighting that the franchisee selected. Hass Deposition (Doc. 56-1) at 73.

At no point does the agreement mention granular details like the location of outlets or the placement of furniture. Indeed, Hass testified that what Hilton

13

Domestic reviewed and approved were merely "specs," or broad indications of how the Montgomery DoubleTree would be furnished that did not specifically show the physical placement of outlets or fixtures, *id.* at 50, or of furniture, *see id.* at 71.   While Hass did note that Hilton Domestic's brand standards contained recommendations as to where some outlets should be placed, those standards were merely guidance, not mandatory.  *See id.* at 68-69.

The ultimate decisions about the design of the hotel, including decisions about the location of outlets and the layout of furniture, were made by Montgomery Downtown Hotels.  *See id.* at 71.  Hilton Domestic, Hass emphasized, did not "care about furniture placement and things of that nature."  *Id.* at 28.  Indeed, despite the requirements of the franchise agreement, Hass testified that Hilton Domestic neither reviewed nor approved Montgomery Downtown Hotels' design for the lobby before it was renovated.  *See id*. at 62.  The company merely reviewed and accepted the

**14**

design after the fact.  *See id.*

Montgomery Downtown Hotels also changed the layout of the lobby numerous times after the original renovation without Hilton Domestic's approval. Hass testified that employees would "rearrange the lobby all the time" without notifying Hilton Domestic. *Id*. And the guests themselves would move the lamps "all the time," further altering the layout. *Id.* at 40. Once the Montgomery DoubleTree was open, Hass explained, Montgomery Downtown Hotels felt free to organize the lobby however it wanted, without consulting Hilton Domestic. *See id.* at 28. This sort of independent decision making on the part of the franchisee is inconsistent with the centralized management required to establish a duty. *See Allen*, 276 F. App'x at 343 (finding no duty where the franchisor did not participate in the selection of the equipment and the franchisee could make changes without the franchisor's approval).

Based on the uncontroverted evidence in the record,

15

Hilton Domestic did not exercise sufficient control over either the day-to-day operations of the Montgomery DoubleTree or the exact design of the hotel's lobby space to establish a duty. Bender's unsupported allegations cannot prove otherwise. Therefore, Bender has failed to establish a triable issue of fact, and the court will grant summary judgment in favor of Hilton Domestic. An appropriate judgment will be entered.

DONE, this the 14th day of April, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE